## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**SACRED HEART HEALTH SYSTEM, INC.;**
**ST. VINCENT'S HEALTH SYSTEM, INC.;**
**SOUTHERN BAPTIST HOSPITAL OF**
**FLORIDA, INC., d/b/a Baptist Medical**
**Center and Wolfson Children's Hospital,**
**BAPTIST MEDICAL CENTER OF THE**
**BEACHES, INC. d/b/a Baptist Medical**
**Center Beaches, and BAPTIST MEDICAL**
**CENTER OF NASSAU, INC. d/b/a Baptist**
**Medical Center Nassau,** on their own behalf
and on behalf of all **CLASS MEMBERS**
similarly situated**,**

      **Plaintiffs,**

  **Class Representation**

**v.**

  **CASE NO.:**
  3.07cr62 RY/EMT

**HUMANA MILITARY HEALTHCARE**
**SERVICES, INC.,** a Delaware corporation

      **Defendant.**

_____/

### COMPLAINT

COME NOW the individual and representative plaintiffs, Sacred Heart Health

System, Inc.; St. Vincent's Health System, Inc.; Southern Baptist Hospital of Florida,

Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital; Baptist Medical

Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical

Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau, by and through their

Receipt
# 3ZN3-413
# 350

CLERK
DIST. CT.
DIST. FLA.
PENSACOLA, FLA.

07 FEB -5 PM 4: 17

FILED

undersigned attorneys, on behalf of themselves and all others similarly situated, and file this complaint against Defendant Humana Military Healthcare Services, Inc., a Delaware corporation authorized to do business in the State of Florida and allege as follows:

## JURISDICTION AND VENUE

1.     This is an action for damages in excess of $75,000.00 against Defendant Humana Military Healthcare Services, Inc.  In aggregate, the claims of the proposed class exceed $5,000,000.

2.     Plaintiff Sacred Heart Health System, Inc., is a health care system which includes Sacred Heart Hospital in Pensacola, Florida.  Plaintiff St. Vincent's Health System, Inc., is a health care system which includes St. Vincent's Medical Center, a hospital in Jacksonville, Florida.  Plaintiffs Southern Baptist Hospital of Florida, Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital; Baptist Medical Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau are hospitals with their principal places of business in the area of Jacksonville, Florida.

3.     Defendant Humana Military Healthcare Services, Inc. is a private, non-governmental for-profit Delaware corporation which has its principal place of business in Louisville, Kentucky, and does business in many states, including Florida. Defendant Humana Military Healthcare Services, Inc., is a wholly owned subsidiary of Humana, Inc.

2

4.     The contracts entered into between Defendant Humana Military Healthcare Services, Inc. and the plaintiffs were entered into in Pensacola and Jacksonville, Florida, for services to be rendered primarily in the Pensacola (as to Plaintiff Sacred Heart Health System, Inc.) and Jacksonville (as to the remaining named plaintiffs), Florida areas.

5.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (2005).

6.     Venue is proper in the United States District Court for the Northern District of Florida, Pensacola Division, pursuant to 28 U.S.C. § 1391(2005) and Local Rule 3.1.

## BACKGROUND AND PARTIES

7.     This proposed class action involves institutional health care providers, primarily hospitals, who contracted in writing with the defendant, Humana Military Healthcare Services, Inc. (hereinafter "Humana"), to provide outpatient non-surgical healthcare services to certain individuals, called beneficiaries, in exchange for agreed upon rates to be paid by Humana to the institutional health care providers.

8.     The beneficiaries under the contracts with Humana include dependents of active military and retired military and their dependents in the federal government's TRICARE program.

3

9.     The TRICARE program was established in 1995 by the Department of Defense ("DoD"). The TRICARE program is a managed health care program and includes the competitive selection of contractors (such as Humana) to financially underwrite the delivery of health care services under the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS").

10.     CHAMPUS is administered by the Secretary of Defense. The Secretary of Defense is charged with implementing and enforcing rules for the CHAMPUS/TRICARE program.   The Secretary delegated that responsibility to the Assistant Secretary of Defense for Health Affairs, who, in turn, initially delegated the day-to-day administration of the program to the Director of the Office of CHAMPUS ("OCHAMPUS").

11.     OCHAMPUS contracted with Defendant Humana on January 23, 1996 (effective date November 28, 1995) to deliver healthcare to covered beneficiaries for what was then known as Regions 3 and 4, which included the states of Alabama, Florida, Georgia, Mississippi, South Carolina, Tennessee, eastern Louisiana, and a portion of Arkansas.

12.     Humana was called a "Managed Care Support Contractor" (MCSC).

13.     The contract between the government and Humana was based on a fixed price with monthly payments to Humana, which was intended to create strong incentives for efficiency and cost-effectiveness in the delivery of health care services.

4

14. Humana's MCSC contract with the government was an "at-risk" contract. The government's contract with Humana included a "requirement for the contractor to assume the 'risk' for the cost of health care provided to CHAMPUS beneficiaries in the civilian community." Humana could realize profits or sustain losses depending upon its performance under the government contract.

15. Prior to the TRICARE program, the government contractors who administered the CHAMPUS system were pure fiscal intermediaries who administered the payments to beneficiaries according to government regulations and rules. The earlier generation fiscal intermediary contracts provided for the government to indemnify and hold harmless the contractor for its actions in administering the payments, and provided for the government to be the real party in interest to any dispute that the fiscal intermediary may have with a provider or beneficiary.

16. By contrast, with the establishment of the TRICARE program, the contractors, now known as MCSCs, were no longer simply fiscal intermediaries, but rather at-risk contractors with considerable autonomy. The government intentionally removed any indemnification provisions or real party in interest language in the TRICARE contracts to reflect the new relationship between an MCSC such as Humana and the government under the TRICARE program.

17. By the terms of its TRICARE contract with the government, Humana was required to deliver health care services to the beneficiaries by establishing a network of institutional providers, such as hospitals, and individual providers, such as physicians, by entering into private contracts with those providers. The government was not a party to these "network provider" contracts.

5

18.     The government did not require government review or approval of the network provider contracts which Humana entered into with the network providers. The government did not negotiate, draft, sign, or otherwise participate as a party to the contracts Humana entered into with the providers.  Humana had the discretion to choose which providers with whom it would enter into network contracts.

19.     Humana's contract with the government required Humana to "make timely and accurate reimbursement to all providers of care with whom it has contracts in strict accordance with the terms and conditions of the contracts."

20.     Government regulations existed in 1996 and beyond to provide guidance to Humana in its payments to providers.  For example, regulations existed describing the application of "DRG" rates to inpatient hospital services; the application of "ASC" rates for outpatient surgical services; the application of fee schedules for individual providers such as physicians, sometimes called physicians' CMAC Fee Schedules or CMAC rates (later known as TMAC rates to reflect the terminology change from CHAMPUS to TRICARE); and the application of the hospital's billed charges for those services, such as the outpatient non-surgical services at issue in this case, not specifically subject to another regulation.  Collectively, all of these payment guidelines issued via government regulation were generally referred to as CHAMPUS (or TRICARE) maximum allowable charges.

6

21.    Until August 12, 2002, the government had promulgated no regulation setting forth any CHAMPUS maximum allowable charge for outpatient non-surgical services rendered by an institutional provider other than the hospital's billed charges. As of August 12, 2002, the government purported to amend 32 C.F.R. §199.14 to add subsection "(a)(5)" to allow payment to hospitals for certain outpatient non-surgical services, namely laboratory, radiology, venipuncture, rehabilitation therapy, diagnostic services, ambulance services, durable medical equipment and supplies, oxygen supplies, and certain medicines, to be made based on the physicians' CMAC Fee Schedules.

22.    Although the regulations issued by the government provide guidelines to Humana for its payment to providers, ultimately the payment to the network provider is dependent upon whatever Humana chose to agree to pay the network provider in the provider contracts.

23.    Humana, not the government, chose the payment terms in each provider contract.  Humana was empowered to pay a provider amounts in excess of CHAMPUS maximum allowable charges or to enter into a contract with a provider that set forth alternate reimbursement methodologies for payment for services, provided that the alternate reimbursement methodology was specifically provided for in the contract with the provider.

24.    Regardless of whatever Humana agreed to pay a network provider in the provider contract, Humana was required by the terms of its government contract to strictly abide by the terms of its provider contracts.

25.    Were Humana to fail to pay its providers in strict accordance with the provider contracts, Humana would be in breach of its government contract.

7

26.     When Humana first entered into contracts with institutional providers beginning in 1996, Humana understood that the CHAMPUS maximum allowable charge for outpatient non-surgical services was the hospital's billed charges.

27.     Regardless of the CHAMPUS maximum allowable charge, Humana was allowed to negotiate different payment amounts and methodologies with the providers in order to entice them to participate in the network.

28.     The plaintiffs are institutional providers with whom Humana entered into contracts to provide health care services in Regions 3 and 4.  These contracts generally provided that in exchange for agreeing to deliver healthcare services to covered beneficiaries, Humana would pay the healthcare providers agreed upon amounts as set forth in their contracts.  The DoD was not a party to the contracts between Humana and the plaintiffs.

29.     Plaintiffs, Sacred Heart Health System, Inc., which includes Sacred Heart Hospital; St. Vincent's Health System, Inc., which includes St. Vincent's Medical Center; Southern Baptist Hospital of Florida, Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital in Jacksonville, Florida; Baptist Medical Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau, are institutional providers of healthcare located in the Pensacola and Jacksonville, Florida areas.  The plaintiffs contracted with Humana to render healthcare services to covered beneficiaries in exchange for agreed upon amounts as set forth in their contracts with Humana.

## GENERAL ALLEGATIONS

30.     Humana entered into written contracts with each of the plaintiffs and other

8

institutional healthcare providers whereby the plaintiffs agreed to provide certain "covered" healthcare services to beneficiaries in exchange for Humana's payment to the plaintiffs of certain agreed upon amounts of money. One category of the healthcare services to be provided by the plaintiffs was outpatient non-surgical services, including, but not limited to, outpatient radiology and laboratory services.

31.    For outpatient non-surgical services rendered prior to October 1, 1999, the plaintiffs and other institutional providers were paid by Humana according to the terms of their written contracts with Humana.

32.    For outpatient non-surgical services rendered beginning effective October 1, 1999, Humana abruptly ceased paying the plaintiffs, and the proposed class members whom they represent, the amounts listed in the contracts for outpatient non-surgical services.

33.    For outpatient non-surgical services rendered beginning effective October 1, 1999, Humana began reducing these payments by limiting payments to the lesser of the contracted rates or physicians' CMAC Fee Schedules or rates (sometimes known as TMAC Fee Schedules or rates).

34.    Prior to services rendered October 1, 1999, Humana had never before imposed the CMAC Fee Schedules on the plaintiffs and other institutional providers for hospital outpatient laboratory and radiology services.

35.    The first payments by Humana to the institutional providers for these outpatient non-surgical services were made on or about December 2, 1999.

36.     Humana asserts that it sent to the institutional providers a letter via U.S. Mail dated November 18, 1999, that stated that outpatient laboratory and radiology claims would be paid on the basis of CMAC rates beginning October 1, 1999.

37.     The particular outpatient non-surgical services which were limited to CMAC Fee Schedules effective for services rendered October 1, 1999, were radiology and laboratory services.     Humana expanded the CMAC Fee Schedule limitation simultaneously to all members of the proposed class for therapy services as of March 1, 2001; medicine and ambulance services as of January 1, 2002; and some additional miscellaneous services as of April 2, 2003.

38.     Each time Humana imposed the physicians' CMAC Fee Schedule upon additional hospital outpatient non-surgical services, Humana did so for each network provider at the same time for the same reasons.

39.     Humana's failure to pay the plaintiffs in accordance with the terms of their contracts with the plaintiffs constituted a breach of those contracts.

40.     Unbeknownst to the plaintiffs at the time, Humana applied for a value engineering change proposal to the DoD whereby Humana sought additional compensation from the DoD, presumably nationwide, for Humana's initiative to apply CMAC Fee Schedules to these services and the savings which would result in failing to pay the institutional providers what Humana earlier had contracted to pay to them for services rendered under the provider contracts.

## CLASS REPRESENTATION ALLEGATIONS

10

41.    Pursuant to Rule 23, Fed. R. Civ. P., plaintiffs bring this action individually and on behalf of the class initially defined as: All institutional healthcare service providers in TRICARE Regions 3 and 4 which had contracts with Humana to provide outpatient non-surgical services to CHAMPUS/TRICARE beneficiaries as of November 18, 1999, excluding those network providers who contractually agreed with Humana to submit any such disputes with Humana to arbitration.

42.    *Numerosity*:   Plaintiffs are representatives of approximately three hundred or more institutional healthcare providers which had contracts with Humana to provide outpatient non-surgical services to CHAMPUS/TRICARE beneficiaries.   The members of the class are so numerous that separate joinder of each member is impracticable.  Class members may be notified of the pendency of this action by regular mail.

43.    *Commonality*: The questions of law or fact which are common to the claims of the plaintiffs and the class include:

i.    Whether Humana unilaterally, universally, and simultaneously paid all of the proposed class members for outpatient non-surgical services based upon billed charges or flat fees prior to services rendered October 1, 1999, but then began unilaterally, universally, and simultaneously paying all of the proposed class members for such services based on physician CMAC fee schedules beginning effective October 1, 1999.

ii.    Whether Humana breached its contracts with these plaintiffs and the members of the proposed class by applying

11

CMAC Fee Schedules to these institutional providers for outpatient non-surgical services beginning effective October 1, 1999.

iii.     Whether at the time Humana unilaterally, universally, and simultaneously began imposing CMAC Fee Schedules upon the named plaintiffs and class members by its imposition of CMAC Fee Schedules beginning effective October 1, 1999, Humana had any valid authority to unilaterally change its payment from a billed charges or flat fee basis to a CMAC Fee Schedule basis.

iv.     To the extent that Humana may claim as a defense that Humana was required by some unidentified law or government regulation to pay the plaintiffs and the proposed class amounts not stated in their contracts whether such law or government regulation, if any, actually required Humana to pay all institutional providers based on the physicians' CMAC Fee Schedules beginning effective October 1, 1999, despite the contractual terms between Humana and the institutional providers; when the government's CHAMPUS maximum allowable charge for outpatient non-surgical services changed, if even from hospital billed charges to physician CMAC Fee Schedules; and whether a change in the government's CHAMPUS maximum allowable charge, if any, affected the payment terms of an existing contract between Humana and the institutional providers.

12

v.      Whether plaintiffs and the members of the proposed class sustained damages as a result of Humana's improper application of CMAC Fee Schedules, and what is the measure of damages, where all of the class members' damages are calculable in the same manner, that is, by taking what Humana actually paid and comparing that amount to what it would have paid under the contracts had the CMAC Fee Schedules not been imposed by Humana beginning effective October 1, 1999.

44.     *Typicality*:  The claims of the named plaintiffs are typical of the claims of all of the class members because their claims arise from the same course of conduct by Humana that gave rise to the claims of all other class members, specifically Humana's unilateral, universal and simultaneous application of CMAC Fee Schedules to each of the institutional class members.  The legal theories asserted by plaintiffs are the same legal theories that would be advanced by all class members, specifically that Humana breached its contracts due to its application of CMAC Fee Schedules to the institutional class members. Humana's application of CMAC Fee Schedules to institutional providers for outpatient non-surgical services is the core issue which predominates over all other issues of law or fact in this litigation which may affect only individual members of the class.

45.     *Adequacy*: The named plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the class.  The plaintiffs have the same interests as all other class members to demonstrate that Humana breached their contracts by imposing CMAC Fee Schedules for outpatient non-surgical services for services beginning effective October 1, 1999.  Plaintiffs have retained counsel competent

13

and experienced in complex class action litigation, and plaintiffs intend to prosecute this action vigorously.

46.     Rule 23(b)(3), Fed.R.Civ.P.:  Defendant's improper application of CMAC Fee Schedules and its breach of its contracts with the class as to the rates paid for outpatient non-surgical services are the predominant factual and legal issues such that a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Individual joinder of all members of the class is impracticable.  Further, the burden to the courts of handling over three hundred individual cases arising from the same operative facts and legal issues would be excessive and would create an unnecessary strain on judicial resources.  Individual litigation would also increase the expense of the litigation to all parties and to the court system, whereas a class action could concentrate all of the litigation in one forum with no unusual manageability problem, particularly where, as here, the improper application of CMAC Fee Schedules by Humana and its breach of contract can be readily proven through common class-wide proofs.

47.     *Previously filed related cases*:  Prior to this class action being filed, prior class actions encompassing the same class as is proposed in this case on the same issue of breach of contract by Humana for failure to pay properly for outpatient non-surgical services rendered by institutional providers in former TRICARE regions 3 and 4, were filed and pending for several years, tolling the statute of limitations for the plaintiffs and the proposed class.  (*Baptist Hospital, Inc. and The Healthcare Authority of the City of Huntsville v. Humana Military Healthcare Services, Inc.*, Case No. 2002-001385, filed July 1, 2002, in the Circuit Court in and for Escambia County, Florida, which case

14

subsequently was removed to the United States District Court for the Northern District of Florida, and assigned Case Number 3:02cv317 upon removal; and *Board of Trustees of Bay Medical Center, a special district of the State of Florida, Baptist Hospital, Inc. and The Healthcare Authority of the City of Huntsville v. Humana Military Healthcare Services, Inc.*, Case No. 5:03cv144, filed July 1, 2003, in the United States District Court for the Northern District of Florida.)  The named plaintiffs and Humana resolved their individual claims prior to the court ruling on the motion for class certification in Case No. 5:03cv144.

### COUNT I:  BREACH OF CONTRACT AGAINST HUMANA

48.     Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 47 above as if fully restated herein.

49.     This is an action for breach of contract against Humana.

50.     Plaintiffs each entered into a contract with Humana to provide outpatient non-surgical services to CHAMPUS/TRICARE beneficiaries in exchange for Humana's payment to plaintiffs of a specified compensation for such outpatient non-surgical services.

51.     Plaintiff Sacred Heart Health System, Inc. entered into a contract with Humana with an effective date of September 1, 1999. A true and correct copy of this contract is attached as Exhibit 1 (the exact percentage of billed charges has been purposefully redacted from the copy for filing with the Court). The payment provision is found on Attachment B-1, where the contract sets forth various flat fees for CT scans and MRI services, with a "[number redacted]% of Billed Charges" for the remaining outpatient non-surgical services.

15

52.     Plaintiffs St. Vincent's Health System, Inc.; Southern Baptist Hospital of Florida, Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital; Baptist Medical Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau, entered into a contract with Humana with an effective date of September 1, 1999. The contracts between these plaintiffs and Humana are substantively identical. Each required Humana to pay these plaintiffs a certain percentage of the plaintiffs' billed charges for other outpatient services. True and correct copies of these contracts are attached as composite Exhibit 2 (the exact percentage of billed charges has been purposefully redacted from the copy for filing with the Court). The payment provision is found on Attachment B-1, where the contract, after specifying the payment rates for outpatient surgical services, states that "All other outpatient services" will be paid "[number redacted]% Discount Off Billed Charges."

53.     Regardless of the exact amount Humana contractually agreed to pay each of the plaintiffs for outpatient non-surgical services, Humana unilaterally and simultaneously began limiting payment to the lesser of the contracted rates or the physicians' CMAC Fee Schedules for outpatient non-surgical services rendered beginning October 1, 1999.

54.     Humana breached its contracts with plaintiffs when Humana failed to pay the contracted rates, but instead began paying the lesser of the contracted rates or the physicians' CMAC Fee Schedules for outpatient non-surgical services beginning on or about October 1, 1999.

55. Plaintiffs have been damaged by Humana's breach in that they have received from Humana less compensation for outpatient non-surgical services than plaintiffs and the class contracted to receive from Humana.

56. In February 2000, Plaintiffs St. Vincent's Health System, Inc.; Southern Baptist Hospital of Florida, Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital; Baptist Medical Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau contested Humana's payment of outpatient non-surgical services based upon a CMAC Fee Schedule. Despite Plaintiffs' contesting of Humana's payments, Humana declined at that time to rectify its breach of contract. Humana replied that it was required by the government to limit payments to CMAC Fee Schedules, which was false.

57. Plaintiff Sacred Heart Health System, Inc. amended its contract effective February 1, 2001, which amendment provided for the first time that laboratory and radiology outpatient non-surgical services would be paid a specified percentage off the CMAC Fee Schedule. A true and correct copy of this Amendment is attached as Exhibit 3. Plaintiff Sacred Heart Health System, Inc. entered into a new contract with Humana effective January 15, 2005. A true and correct copy of the January 15, 2005, contract is attached as Exhibit 4. This breach of contract action does not apply to services rendered by Plaintiff Sacred Heart Health System, Inc. after January 15, 2005.

58. Plaintiffs Southern Baptist Hospital of Florida, Inc., d/b/a Baptist Medical Center and Wolfson Children's Hospital; Baptist Medical Center of the Beaches, Inc. d/b/a Baptist Medical Center Beaches; and Baptist Medical Center of Nassau, Inc. d/b/a Baptist Medical Center Nassau and Humana amended their contracts effective September

17

1, 2006, which amendment provided for the first time that laboratory, radiology, and other outpatient non-surgical services with a "TMAC" fee schedule be paid a specified percentage off the TMAC fee schedule, and further provided for payment based upon the TRICARE Outpatient Prospective Payment System (OPPS) when that payment methodology takes effect.  A true and correct copy of this amendment to the contract is attached as Exhibit 5 (the exact payment rates have been purposefully redacted from the copy for filing with the Court).  This breach of contract action does not apply to services rendered by these plaintiffs after the amendment of September 1, 2006.

### COUNT II:  FRAUD IN THE INDUCEMENT AGAINST HUMANA (PLAINTIFF SACRED HEART HEALTH SYSTEM, INC. AS INDIVIDUAL PLAINTIFF-NO CLASS ALLEGATIONS)

59.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 40, 51, and 57 above as if fully restated herein.

60.    This is an action brought by Sacred Heart Health System, Inc. against Humana for fraud in the inducement related to the February 1, 2001, contract amendment (Exhibit 3).  This action is brought individually by Sacred Heart Health System, Inc., and not as a representative for a class.

61.    As inducement for Sacred Heart Health System, Inc. to enter into the February 1, 2001, contract amendment, Humana informed Sacred Heart Health System, Inc., particularly including employee Michael P. Smith, that the government required Humana to pay no more for outpatient non-surgical services, specifically hospital radiology and laboratory services, than the amounts set forth in physicians' CMAC Fee Schedules.  Humana's representations regarding CMAC Fee Schedules were false and involved a fact material to the February 1, 2001, contract amendment.

18

62.     Humana knew or should have known that the government did not actually require Humana to limit payment for hospital outpatient laboratory and radiology services to physicians' CMAC Fee Schedules beginning February 1, 2001.

63.     Humana's representations to Plaintiff Sacred Heart Health System, Inc. regarding CMAC Fee Schedules were made with the intent to induce Plaintiff Sacred Heart Health System, Inc. to enter into the February 1, 2001, contract amendment.

64.     Plaintiff Sacred Heart Health System, Inc. detrimentally relied upon the representations of Humana regarding CMAC Fee Schedules when entering into the February 1, 2001, contract amendment.

65.     Had Plaintiff Sacred Heart Health System, Inc. known that Humana's statement was false, it would not have entered into the February 1, 2001, contract amendment under the payment terms set forth in that contract amendment.

66.     Humana used its position, authority, and superior knowledge as the sole TRICARE contractor for the southeastern United States to conceal the fact that Humana was not actually required by the government to limit payment to CMAC Fee Schedules for outpatient non-surgical services beginning February 1, 2001. Plaintiff Sacred Heart Health System, Inc. did not learn of the falsity of Humana's representation regarding CMAC Fee Schedules until recently. Furthermore, Humana's act of fraud and concealment by falsely informing the plaintiff that the government required Humana to limit payment to physicians' CMAC Fee Schedules tolled the statute of limitations for this action of fraud in the inducement as to the February 1, 2001, contract amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

19

A.     Certify this action as a class action pursuant to Rule 23, Fed.R.Civ.P. and define the class as set forth in paragraph 41 of this complaint.

B.     Award plaintiffs and the members of the class damages from Humana as a result of the breach of contract by Humana.

C.     Award plaintiffs and members of the class all taxable costs of this litigation from Humana.

D.     Award plaintiffs and members of the class reasonable attorneys' fees and costs from Humana.

E.     Award plaintiffs and members of the class such other and further relief from Humana as this Court may deem just and proper.

F.     Award Plaintiff Sacred Heart Health System, Inc. damages for its individual claim against Humana for fraud in the inducement as set forth in Count II of this complaint, and any such other and further relief from Humana as this Court may deem just and proper.

J. NIXON DANIEL, III
Florida Bar No.: 228761
RUSSELL F. VAN SICKLE
Florida Bar No.: 967289
BEGGS & LANE. LLP
501 Commendencia Street
Pensacola, FL 32501
Tel: (850) 432-2451
Fax: (850) 469-3331

Attorneys for Plaintiffs

20